FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

May 03, 2017

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL LAW AND POLICY, | No. 2:15-CV-0264-SMJ |
| Plaintiff, | **ORDER GRANTING PERMANENT INJUNCTION AND SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR** |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE; and JAMES W. KURTH, in his official capacity as Acting Director of the United States Fish and Wildlife Service, | |
| Defendants. | |

On April 13, 2017, the Court held a hearing on Plaintiff Center for Environmental Law and Policy's (CELP) motion for Permanent Injunction and Entry of Judgment, ECF No. 49. At the hearing, the Court granted CELP's request for a permanent injunction, with terms outlined by the Court. ECF No. 74. This Order memorializes and supplements the Court's oral ruling.

## I. INTRODUCTION

Congress enacted the Clean Water Act (CWA) "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §

1251(a). Consistent with this goal, "[a] cornerstone of the [CWA] is that the 'discharge of any pollutant' from a 'point source' into navigable waters of the United States is unlawful unless the discharge is made according to the terms of an [National Pollutant Discharge Elimination System (NPDES)] permit . . . ." *Ass'n to Protect Hammersley, Eld, and Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002) (citations omitted). Defendants (collectively FWS) have been violating this fundamental CWA requirement by discharging pollutants into Icicle Creek from the Leavenworth National Fish Hatchery (the Hatchery) without an NPDES permit since 1979. ECF No. 42.

The question now before the Court is what the appropriate remedy for this continuing CWA violation should be. CELP acknowledges the impracticability of enjoining all discharge from the Hatchery and therefore seeks a narrower injunction requiring: (1) immediate monitoring, and (2) beginning in September 2019 if no NPDES permit is in place, compliance with the phosphorus wasteload allocation set in the watershed's dissolved oxygen and pH Total Daily Maximum Load (TMDL). FWS urges the Court to stay or dismiss this action under the doctrine of primary jurisdiction to permit EPA to issue a final NPDES permit. FWS argues in the alternative that the balance of hardships and public interest do not favor injunctive relief.

The doctrine of primary jurisdiction permits a Court to determine that certain technical and policy claims should be addressed in the first instance by an agency. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015). The Court declines to apply the doctrine for two reasons: First, determining a remedy for FWS's CWA violation does not require agency technical expertise. Second, given the extraordinary delay in permitting to this point, the Court cannot rely on FWS's representation that EPA will issue a final NPDES permit in an acceptable timeframe. Referral to EPA would risk unacceptable delay.

The Court also finds that CELP has met its burden of demonstrating that an injunction is necessary: CELP has suffered irreparable injury; no adequate legal remedy is available; and the balance of hardships and public interest weigh very strongly in favor of granting injunctive relief.

The Court recognizes that requiring immediate monitoring could create inefficiency and unnecessary hardship if, as FWS suggests, a final NPDES permit is in place later this year. Accordingly, the Court will not require monitoring to begin until January 1, 2018. The Court also recognizes that it may be difficult for FWS to comply with the TMDL wasteload allocation by September 2019. But FWS has had nearly four decades to complete the NPDES permitting process and work with EPA to develop an achievable timeline for attaining compliance with water quality standards. The Court finds that there is no workable alternative at this time to

ordering compliance by a set date with the wasteload allocation the expert agencies have found necessary to protect water quality. Accordingly, if a final NPDES permit is not effective on September 1, 2019, FWS shall limit phosphorous discharge from the Hatchery to the wasteload allocation set in the dissolved oxygen and pH TMDL.

## II.     BACKGROUND

### A.     Icicle Creek and the Leavenworth National Fish Hatchery

Icicle Creek originates in the Cascade Mountains and is a tributary to the Wenatchee River, which is a tributary to the Columbia River. ECF No. 14 at 6. Icicle Creek is home to populations of a number of fish species, including ESA-listed steelhead and bull trout, and Chinook salmon. *Id.* at 6; ECF No. 50 at 9.

The Leavenworth National Fish Hatchery (the Hatchery), which is operated by the United States Fish and Wildlife Service, is located on Icicle Creek approximately three miles upstream from the point where Icicle Creek enters the Wenatchee River. ECF No. 1 at 7, 10; ECF. No. 14 at 3. The Hatchery was constructed to maintain salmon stocks lost when Grand Coulee Dam was completed on the Columbia River. ECF No. 1 at 10–11; No. 14 at 3. It currently propagates spring Chinook salmon and is also used for acclimation and release of Coho salmon. ECF No. 50 at 10–11. The Hatchery operates year round. *Id.* at 11.

During normal operation, the Hatchery discharges water from its fish rearing raceways, tanks, and ponds to Icicle Creek at "Outfall 1," at approximately river

mile 2.8. ECF No. 14 at 4–5; ECF No. 50 at 11. This water "contains some organic solid wastes that consist of uneaten food and fecal matter." ECF No. 15 at 16. The Hatchery also regularly discharges effluent from pollution abatement ponds at "Outfall 2," at approximately river mile 2.7. ECF No. 14 at 5; ECF No. 50 at 12. The water discharged at Outfall 2 contains "re-suspended organic solids created when the bottom of the rearing ponds are cleaned" including "fish food, fecal matter and other debris." ECF No. 15 at 16–17. Additionally, the Hatchery began discharging effluent from a new location known as "Outfall 6" in August 2015. ECF No. 14 at 6.

## B.     Relevant Provisions of the Clean Water Act

Section 303 of the CWA requires states to establish water quality standards. 33 U.S.C. § 1313(a)–(c). "A water quality standard defines the water quality goals of a water body, or portion thereof, by designating the use or uses to be made of the water and by setting criteria that protect the designated uses." 40 C.F.R. § 131.2. Section 303(d) requires states to list water bodies within its boundaries that do not meet water quality standards. 33 U.S.C. § 1313(d). For these waters, the state must establish and submit to the EPA a total maximum daily load (TMDL) specifying the amount of pollution that can be discharged while still achieving water quality standards. 33 U.S.C. § 1313(d)(1)(C), (d)(2); *Friends of Pinto Creek v. U.S. Envtl. Prot. Agency*, 504 F.3d 1007, 1011 (9th Cir. 2007). "Once a TMDL has been

completed, a wasteload allocation . . . for that TMDL forms the basis for permit limitations for individual discharges." 50 Fed. Reg. 1774, 1774 (Jan. 11, 1985).

Section 301(a) of the CWA makes discharge of any pollutant unlawful, except when in compliance with other provisions of the CWA. 33 U.S.C. § 1311(a). One of those exceptions is discharge in compliance with a permit issued under section 402 of the CWA. Section 402 establishes the National Pollutant Discharge Elimination System (NPDES), which authorizes EPA to issue permits for discharge of pollutants. 33 U.S.C. § 1342; *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 71 (1980). NPDES permits are a primary means for achieving the CWA's goals. *Arkansas v. Oklahoma*, 503 U.S. 91, 101–02 (1992). Before EPA can issue an NPDES permit, the appropriate state must issue a certification under section 401 that the activity will not violate water quality standards. 33 U.S.C. § 1341(a).

## C. NPDES Permitting for Discharges From the Hatchery

It is undisputed that the Hatchery discharges pollutants into Icicle Creek,[1] that portions of Icicle Creek and the Wenatchee River have been identified as failing to meet certain water quality standards, and that an NPDES permit is required for discharges from the Hatchery. ECF No. 1 at 10–11; ECF No. 7 at 5–6. ECF No. 50 at 14. EPA issued an NPDES permit authorizing discharge from the Hatchery on

---

[1] These discharges may include uneaten fish food, fecal matter, fish carcasses, spawning waste, disease control chemicals, pathogens, nitrogen, phosphorus, antibiotics, and other chemicals. ECF No. 1 at 11; ECF No. 7 at 6.

December 30, 1974, which became effective on January 30, 1975. ECF No. 15 at 77. That permit, by its terms, expired on August 31, 1979. ECF No. 15 at 77. FWS did not submit an application for a new NPDES permit prior to that expiration date. ECF No. 14 at 14.

FWS submitted an application for a new NPDES permit on November 12, 1980. ECF No. 15 at 108. On May 6, 1981, FWS received a letter from EPA advising FWS that its NPDES permit was "automatically extended" in accordance with 40 CFR § 122.5. ECF No. 15 at 110. As discussed in the Court's January 7, 2017 Summary Judgment order, the NPDES permit was not automatically extended and EPA's letter did not effectively extend the permit. ECF No. 42 at 12–15. The Hatchery has been discharging pollutants into Icicle Creek without an NPDES permit since September 1, 1979.

As a result of a settlement agreement reached in a lawsuit concerning EPA's delay in issuing an NPDES permit, FWS filed an application for a new NPDES permit in November 2005.[2] ECF No. 15 at 125, 133. EPA issued a draft NPDES permit for the Hatchery in June 2006. ECF No. 15 at 132. In October 2006 EPA requested CWA Section 401 certification from Ecology. ECF No. 62 at 2.

_____

[2] It is unclear from the record what, if any, actions state and federal agencies took related to NPDES permitting for the Hatchery between 1981 and 2005.

In 2009 Ecology completed, and EPA approved, the pH and dissolved oxygen TMDL for the Wenatchee River watershed. ECF No. 15 at 64–75. The TMDL includes phosphorous loading capacities for the Wenatchee River and Icicle Creek intended to permit standards for dissolved oxygen and pH to be met. ECF No. 50 at 16. The TMDL assigns a wasteload allocation to the Hatchery of 0.52 kg/day total phosphorus, applicable from March through May, and July through October of each year. ECF No. 15 at 74. Based on this wasteload allocation and the Hatchery's average discharge, the TMDL sets a target concentration of 5.7 micrograms/liter total phosphorus at Outfall 1. *Id.* at 74; ECF No. 50 at 17

Ecology issued its final section 401 certification in January 2010. ECF No. 15 at 149. EPA concluded that the 401 certification created the need to re-analyze data and make significant revisions to the 2006 draft NPDES permit. ECF No. 62 at 2. EPA issued a new draft NPDES permit for public comment in December 2010. *Id.* at 2. But in October 2011, the Hatchery submitted a revised NPDES permit application to account for changes in the Hatchery's operation. ECF No. 15 at 169–79; ECF No. 62 at 3. As a result of this information, EPA concluded that another new draft permit was necessary. ECF No. 62 at 3. In April 2012, the Hatchery sent EPA additional new information to be included in the NPDES permit, including that it planned to begin discharging from a third location. *Id.*

On December 16, 2016, EPA issued a draft NPDES permit for public comment. ECF No. 51 at 83–116. The public comment period ended on February 3, 2017. *Id.* at 83. The draft permit includes, among other things, effluent limits and monitoring requirements for all Hatchery outfalls. *Id.* at 83–116; ECF No. 62 at 3. The draft permit includes a 10-year compliance schedule to meet final effluent limits. ECF No. 62 at 3–4. EPA requested Section 401 certification from Ecology on October 25, 2016. ECF No. 62 at 4. EPA has also begun its consultation process under the Endangered Species Act. *Id.* at 5.

**D.    Procedural History**

CELP filed this action in September 2015 pursuant to the CWA's citizen suit provision, 33 U.S.C. § 1365, alleging that the Hatchery's NPDES permit expired on August 31, 1979, and that FWS has been discharging pollutants into Icicle Creek without a valid NPDES permit since that date. ECF No. 1. CELP moved for summary judgment on the question of liability, requesting that the Court issue an order determining that FWS is in violation of section 301(a) of the CWA for discharging pollutants from the Hatchery without a permit. ECF No. 13. FWS moved for judgment on the pleadings, requesting dismissal of this suit for lack of subject matter jurisdiction, ECF No. 22, and for summary judgment on the basis that this suit is barred under the doctrine of claim preclusion, ECF No. 23.

On January 9, 2017, the Court granted CELP's motion for summary judgment and denied FWS's motion. ECF No. 42. The Court concluded that the Hatchery's NPDES permit was never extended after it expired on August 31, 1979, and the Hatchery has been discharging pollutants into Icicle Creek without an NPDES permit since September 1, 1979. *Id.* at 16–17. CELP now seeks a permanent injunction to enforce compliance with the CWA. ECF No. 49.

## III.   LEGAL STANDARD

Because CELP's motion for a permanent injunction seeks conclusive resolution of the only remaining issue in this case—the appropriate remedy for FWS's violation of the CWA—the Court construes the motion as a motion for summary judgment. Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.   DISCUSSION

CELP acknowledges that immediate cessation of discharge from the Hatchery or compliance with the TMDL set for Icicle Creek is not possible or desirable.

Instead, CELP seeks a narrower injunction requiring: (1) continuous monitoring of Hatchery Outfalls 1 and 2 for phosphorous beginning within 10 days of the Court's order; (2) that if there is no final NPDES permit by September 1, 2019, beginning on that date FWS shall not discharge phosphorus in excess of the wasteload allocation identified in Ecology's dissolved oxygen and pH TMDL; and (3) flow and phosphorus monitoring at Outfalls 1 and 2, with the resulting data provided to CELP or made publicly available. ECF No. 49 at 7–8. FWS opposes this request and argues first that the Court should stay or dismiss this action under the doctrine of primary jurisdiction to allow EPA to issue a final NPDES permit. ECF No. 61 at 6. In the alternative, FWS argues that the Court should deny CELP's request for an injunction because CELP has failed to meet its burden of showing that injunctive relief is necessary or that the requested relief is appropriately tailored to the harm. *Id.* at 4.

**A.    The Court declines to apply the primary jurisdiction doctrine to stay or dismiss this case.**

"Primary jurisdiction is a prudential doctrine that permits courts to determine 'that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)). No fixed formula exists for determining

whether to apply the doctrine, but Courts should generally look to "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) (citation omitted). The primary jurisdiction doctrine "is reserved for a 'limited set of circumstances' that 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Astiana*, 783 F.3d at 760 (citation omitted). A court should not invoke primary jurisdiction "when referral to the agency would significantly postpone a ruling that a court is otherwise competent to make." *Id.* at 761.

Application of the primary jurisdiction doctrine is inappropriate here because resolution of the specific question before the Court does not require agency expertise. FWS is correct that the Court is ill equipped to resolve the technical issues involved in setting NPDES permit conditions. EPA and Ecology have that expertise and regulatory authority. But the issue to be resolved here is not what specific requirements should be included in the NPDES permit—which would certainly be appropriately decided by EPA and Ecology in the first instance—it is how to remedy FWS's continued discharge of pollutants without an NPDES permit. The Court is

empowered and competent to resolve that question and to craft an equitable remedy if appropriate.

Application of the doctrine is also inappropriate because referral to the EPA would risk unacceptable delay. FWS has failed to achieve compliance with its CWA obligations despite apparently working with EPA and Ecology on the issue for more than a decade.[3] The Court cannot countenance further delay, and the agencies involved have not shown that they can expeditiously complete the NPDES permitting process for the Hatchery on their own.

To be clear, the primary jurisdiction doctrine has its place, *see, e.g.*, *Astiana*, 783 F.3d at 761 (applying the primary jurisdiction doctrine was appropriate in determining what compounds may be labeled as natural on cosmetic products regulated by the FDA); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1115 (9th Cir. 2008) (applying the primary jurisdiction doctrine when new technology was at issue—determining, for the first time, whether a Voice over Internet Protocol provider is a telecommunications carrier for the purpose of certain FCC regulations), but it need not be applied simply because a complicated regulatory scheme applies

---

[3] FWS points out that a ruling just months before EPA issues a final NPDES permit is inefficient and would waste hatchery resources. ECF No. 61 at 9–10. This may be true if the Court directed FWS to do anything immediately. But as discussed below, the Court will not require immediate monitoring. If an NPDES permit is completed on FWS's anticipated timeline, the Hatchery will not be required to expend any additional resources to comply with this order.

to the subject matter before the court. Here, the Court, not EPA, is in the best position to determine and enforce a remedy for FWS's CWA violation.

## B. CELP has met its burden of proving that permanent injunctive relief is necessary.

"[A] plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

The Court finds that FWS's discharge of pollutants harmful to fish and in violation water quality standards without a permit constitutes irreparable injury. *See Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1160 (D. Idaho 2012) (finding irreparable injury from discharge of pollutants harmful to aquatic life); *See Or. State Pub. Interest Research Grp. v. Pac. Coast Seafoods Co.*, 374 F. Supp. 2d 902, 904–07 (D. Or. 2005) (same). The Court also finds—and the parties agree, ECF No. 61 at 12 n. 4—that no adequate legal remedy is available. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages.").

ORDER GRANTING
PERMANENT INJUNCTION - 14

FWS focuses on the balance-of-hardships element, arguing that CELP fails to show that the balance of hardships warrants injunctive relief. ECF No. 61 at 14. FWS further argues that monitoring would create unnecessary expense and would not remedy the alleged harm or yield useful data, and that it will be impossible to meet the proposed 2019 deadline to comply with the TMDL wasteload allocations and continue producing the fish necessary to meet statutory and treaty obligations. *Id.* at 14–17.

The Court accepts, as both parties seem to agree, that it would be difficult for FWS to achieve compliance with the TMDL's wasteload allocation. But FWS has been discharging pollutants without a permit for over thirty-seven years. Even if no permit is in place by September 2019,[4] the balance of hardships favors granting relief. While it may be difficult for the Hatchery to achieve compliance with the TMDL by September 2019 and maintain production levels, the CWA prohibits discharge of pollutants without a permit and that prohibition must be enforceable if it is to have any meaning. The Court finds that there is no legitimate alternative to requiring compliance with the wasteload allocations set by the TMDL by a specific date. At this point—after nearly 40 years of illegal discharge from the Hatchery— the hardship faced by the plaintiff who is attempting to enforce compliance with the

---

[4]If, as FWS expects, a final permit is in place by fall 2017, granting the requested injunctive relief here would result in minimal hardship to FWS.

law to protect water quality greatly outweighs the hardship to FWS. Further the public interest demands such action, not only to protect the water quality of Icicle Creek, but because the public has an undeniable interest in a meaningfully enforceable CWA.

The Court finds that CELP has demonstrated that permanent injunctive relief is necessary in this case.

**C.    Permanent Injunction**

"District courts have 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong.'" *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 999 (9th Cir. 2000) (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994)). CELP argues that the relief it seeks will promote eventual compliance with CWA goals and is "well within the sound discretion of the Court to 'ensure ultimate compliance with the CWA.'" ECF No. 49 at 10 (quoting *Alaska Ctr. for the Env't v. Browner*, 20 F.3d at 986–87). CELP further argues that its proposed injunction is narrowly tailored and an appropriate remedy for FWS's illegal discharges. ECF No. 49 at 25. In objecting to the proposed injunction, FWS focuses primarily on the costs of monitoring, and on the alleged impossibility of achieving compliance with the TMDL by September 2019.

### 1. Monitoring

CELP argues that requiring FWS to "immediately begin to monitor and disclose the amount of phosphorus discharged will facilitate its eventual compliance with the CWA, including the wasteload allocation." ECF No. 49 at 25. CELP further argues that "[m]aking [the] monitoring data readily available to those involved in restoring Icicle Creek will help remedy the harm that has been caused by FWS discharging without an NPDES permit and without monitoring its discharges for most pollutants of concern for the last several decades." *Id.* at 25–26. FWS argues that monitoring requirements could be inconsistent with what is ultimately required by the NPDES permit, thus creating unnecessary expense, and would not yield scientifically valid or useful data because CELP has not proposed a Standard Operating Procedure and Quality Assurance Project Plan. ECF No. 61 at 15.

CELP is correct—and FWS does not appear to disagree—that monitoring is a key part of ensuring compliance with limitations imposed by the CWA. However, FWS is also correct that requiring monitoring now could be problematic if an NPDES permit is issued in a few months and includes different monitoring requirements. Accordingly, the Court will not impose an immediate monitoring requirement. Instead, if a final NPDES permit is not in effect on January 1, 2018, on that date FWS shall begin monitoring phosphorus discharge from Outfall 1 and Outfall 2. And FWS shall make the data collected publicly and conspicuously

available on its website. To ensure that monitoring data is scientifically valid and useful, the parties shall confer and propose a monitoring plan to the court on or before September 1, 2017.

### 2. Complying with the TMDL beginning on September 1, 2019

The TMDL assigns a phosphorus wasteload allocation of 0.52 kg/day during the periods of March through May and July through October. ECF No. 15 at 74. This would be a very significant reduction from 2002 levels. *Id.* at 75. FWS argues that it cannot reduce phosphorus in discharges from the Hatchery to the TMDL's wasteload allocation by September 2019 and continue producing the numbers of fish it must produce under statutory and treaty obligations. ECF No. 61 at 15.

The Court is sympathetic to FWS's position, but as discussed, given the extraordinary permitting delay in this case, the Court finds that it must set a deadline for compliance. And as FWS repeatedly points out, the Court does not have the expertise to fashion its own NPDES permit. In this circumstance the Court finds that it is appropriate to order compliance with the limits already set by Ecology and approved by EPA in the TMDL. This will simply require FWS to comply with the pollution limitations the expert agencies have already determined necessary to protect water quality. Ordering compliance (with more than two years to get there) is hardly unreasonable when FWS has had decades to comply with the CWA through obtaining a final NPDES permit.

# V. CONCLUSION

For the reasons discussed, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Permanent Injunction and Entry of Judgment, **ECF No. 49**, is **GRANTED**.

2. On September 1, 2019, if a final NPDS permit is not in effect for discharges from the Leavenworth National Fish Hatchery, Defendants shall limit the combined phosphorous discharge from Outfall 1 and Outfall 2 to the wasteload allocation set by the dissolved oxygen and pH TMDL for the Wenatchee River watershed (0.52kg/day during the periods of March 1 through May 31 and July 1 through October 31).

3. To ensure meaningful compliance with the effluent limitations taking effect in September 2019, on January 1, 2018, if a final NPDS permit is not in effect for discharges from the Leavenworth National Fish Hatchery, Defendants shall begin monitoring phosphorus discharge from Outfall 1 and Outfall 2. Defendants shall make the data collected publicly and conspicuously available on the Hatchery's website.

4. The parties shall confer and propose a monitoring plan that ensures the scientific validity and usefulness of the monitoring data on or before September 1, 2017.

1    **5.**     The requirements of this injunction shall terminate on the effective

2           date of a final NPDES permit issued for the Leavenworth National Fish

3           Hatchery by the United States Environmental Protection Agency.

4    **6.**     The Clerk's office is directed to **ENTER JUDGMENT** in favor of

5           Plaintiff consistent with this Order and the Court's Order Granting

6           Plaintiff's Motion for Partial Summary Judgment and Denying

7           Defendants' Motion for Judgment on the Pleadings and Motion for

8           Summary Judgment, **ECF No. 42**, as follows:

9           *A.*     Defendants have, continuously since September 1, 1979,

10                 violated section 301(a) of the Clean Water Act, 33 U.S.C. §

11                 1311(a), by discharging pollutants from the Leavenworth

12                 National Fish Hatchery without an NPDES permit.

13          *B.*     Defendants shall comply with the terms of the permanent

14                 injunction imposed by the Court's order until the effective date

15                 of a final NPDES permit authorizing discharges from the

16                 Leavenworth National Fish Hatchery.

17   **7.**     The Clerk's office is directed to **CLOSE** this case.

18         **IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and

19

20

provide copies to all counsel.

**DATED** this 3rd day of May 2017.

SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING
PERMANENT INJUNCTION - 21